```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
JOSEFA LLUBERES                                 :

                Plaintiff,                      :    13 Civ. 4027 (RJS) (GWG)

        -v.-                                    :    REPORT AND
                                                     RECOMMENDATION
CAROLYN W. COLVIN,                              :
Acting Commissioner of Social Security,
                                                :
                Defendant.
                                                :
-----------------------------------------------------------X
```

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Plaintiff Josefa Lluberes brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits and Supplemental Security Income ("SSI") under the Social Security Act. The Commissioner and Lluberes have each moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons stated below, the Commissioner's motion should be granted and Lluberes's motion should be denied.

I.      BACKGROUND

        A.      Lluberes's Claim for Benefits and Procedural History

Lluberes applied for disability benefits on April 15, 2011, and for SSI benefits on April 29, 2011, alleging that she became disabled on February 7, 2009. See Administrative Record, filed Nov. 6, 2013 (Docket # 9) ("R."), 23. She was insured for benefits through December 31, 2012. R. 25. Lluberes was born on February 5, 1962, R. 125, and has most recently worked as a jewelry polisher, R. 31.

On July 11, 2011, the Commissioner denied Lluberes's applications. R. 56-62. Lluberes requested a hearing before an administrative law judge ("ALJ"). R. 66-67. The ALJ held a hearing on March 7, 2012. R. 35-53. On March 28, 2012, the ALJ issued a decision finding that Lluberes was not disabled. R. 23-31. Lluberes appealed the ALJ's ruling to the Appeals Council, R. 15-16, but her request for review was denied on May 17, 2013, R. 1-3.

On June 12, 2013, Lluberes filed the instant lawsuit seeking review of the ALJ's decision. See Complaint, filed June 12, 2013 (Docket # 1). Both parties have moved for judgment on the pleadings.[1]

B.  The Administrative Record Before the ALJ

We have reviewed the Administrative Record that was before the ALJ when he decided Lluberes's claims. Both the Commissioner and Lluberes's attorney have provided summaries of the Administrative Record in their memoranda of law. Neither party has disputed the other party's presentation of the relevant facts. Thus, we accept the "Medical Evidence of Disability" section contained in Lluberes's memorandum, see Pl. Mem. at 4-14, and the "Administrative Record" section contained in the Commissioner's memorandum, see Comm. Mem. at 2-12, as accurate summaries of the relevant portions of the Administrative Record.

---

[1] See Plaintiff's Notice of Motion for Judgment on the Pleadings, filed Feb. 14, 2014 (Docket # 20); Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, filed Feb. 15, 2014 (Docket # 21) ("Pl. Mem."); Commissioner's Notice of Cross-Motion, filed Mar. 14, 2014 (Docket # 25); Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings, filed Mar. 14, 2014 (Docket # 26) ("Comm. Mem."); Plaintiff's Reply Memorandum, filed Apr. 4, 2014 (Docket # 27) ("Pl. Reply"); Reply Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings, filed Apr. 11, 2014 (Docket # 28) ("Comm. Reply").

C.     The ALJ Hearing

A hearing before the ALJ was held on March 7, 2012.  R. 35-53.  Lluberes was represented at the hearing by attorney Richard Morris.  R. 35.  A Spanish language interpreter was provided to Lluberes at the hearing.  R. 37.

At the beginning of the hearing, Lluberes's counsel, Mr. Morris, argued that the ALJ should not consider the report provided by a consultative examiner, Dr. Michael Alexander, because during this examination Lluberes was accompanied by a friend who interpreted for her.  R. 38-39.  Morris questioned the accuracy of the report because he "ha[d] a sense that when a person brings a friend with them to an examination . . . they don't necessarily want to necessarily share everything a psychiatrist might want to know with the friend."  R. 38.  Morris admitted, however, that he was not able to identify any specific deficiencies in the examination because Lluberes "had no recollection of it."  R. 39.

Lluberes testified at the hearing that she was born in the Dominican Republic in 1962 and that she went to school in the Dominican Republic until the third grade.  R. 40.  She did not remember the exact year that she came to the United States, but she thought that it was approximately 1984.  R. 41.  She is not currently working and has not worked since she was briefly employed as a jewelry polisher for North American Packaging in 2010.  Id.  The last time that she worked full time was as a jewelry polisher for W&W Jewelers in 2007.  R. 41-42.  When asked why she had stopped working at W&W Jewelers, Lluberes responded, "[b]ecause it got slow."  R. 42.  Lluberes then clarified that she was laid off from this job.  Id.

The ALJ asked Lluberes when she had last used cocaine, and Lluberes responded "I don't remember."  Id.  Lluberes testified that in September 2010 she was admitted to St. Joseph's Hospital for psychiatric treatment and that she has not been hospitalized since that time.  Id.  She

3

sees Dr. Giovanny Nunez for psychiatric treatment every month.  Id.  When the ALJ asked Lluberes if she was being treated for any physical conditions, Mr. Morris responded that there was "no claim for a physical disability in this case."  R. 44.

Lluberes testified that she lives with her sister and that she cannot travel independently by bus or subway because she gets lost.  Id.  When the ALJ sought clarification on why she gets lost, Lluberes replied, "[b]ecause I don't remember anything."  R. 44-45.  Lluberes then said that whenever she travels she is accompanied by her cousin Ricardo and that he had come with her to the hearing that day.  R. 45.  When asked if anybody comes with her to her medical appointments, she responded that Ricardo "sometimes" accompanies her.  Id.

When the ALJ asked Lluberes how she spends her day, Lluberes began to cry.  Id.  She told the ALJ that she did not feel well, so the ALJ allowed her to take a brief break.  Id.  When Lluberes was ready to continue, the ALJ again asked Lluberes how she spends her day.  R. 46.  Lluberes replied, "I don't want to watch television.  I spend the time by the window on a chair looking out to the street.  I don't feel like bathing myself or eating.  I get to cry a lot."  Id.  She explained that she has been behaving this way for a "long time," since even before she started seeing a psychiatrist.  Id.  She has difficulties with her memory and she cannot "remember anything."  Id.  She has a poor appetite and sometimes has problems sleeping.  R. 46-47.  She takes medication to treat her medical conditions.  R. 47.

Lluberes told the ALJ that she does not leave the house often, not even with her sister.  Id.  Although she is almost always in the house, Lluberes does not help out with the housework or with the cooking.  Id.  Lluberes's sister does all of the chores and the cooking.  Id.  When asked why she could not help her sister with the cooking, Lluberes explained that she was concerned that she would leave the stove on and burn everything.  Id.

4

Lluberes's counsel asked Lluberes why she had started crying earlier at the hearing, and Lluberes replied that it was because she "ha[d] a lot of depression." R. 48. When asked if she dressed herself everyday, Lluberes stated, "No, I remain in robe only . . . [b]ecause I don't feel like bathing myself or anything." Id.

After Lluberes was done testifying, vocational expert, Miriam Greene, testified. R. 48. The vocational expert stated that Lluberes has past relevant work as a jewelry polisher, which is a semi-skilled sedentary job. R. 49. The ALJ then asked the vocational expert if Lluberes would be able to perform her past relevant work, assuming that she has the following limitations: "[Lluberes] can remember and understand and carry out simple instructions, make simple work related decisions, maintain attention and concentration for rote work, can adapt to the usual changes and stress in the work place, maintain a regular schedule with the occasional inability to work in close proximity with others." Id. The vocational expert assessed that, with these limitations, Lluberes would be capable of performing her past work as a jewelry polisher. Id. The vocational expert explained that although jewelry polishing is a semi-skilled job, it is "fairly repetitive and rote." R. 50. Because it is among "the lowest of semi-skilled [jobs]," the expert believed that Lluberes would be able to perform it despite the limitations that the ALJ had asked her to assume. Id.

The vocational expert testified that, even considering Lluberes's age and inability to speak English, there are other medium exertion level jobs that she would be capable of performing including packager, laundry worker, and cleaner, all of which are jobs that exist in significant numbers in the local and national economies. R. 50-51. The ALJ asked the vocational expert to opine on a hypothetical claimant's employability if she had "marked to extreme limitations in all areas of functioning, which would preclude her maintaining attention

and concentration for rote work, for little contact with others." R. 51. The vocational expert opined that "[t]here would be no competitive work possible." Id. Morris asked the vocational expert if a person would be able to perform any of the jobs that the expert had identified assuming that the person would be "unable to maintain attention and concentration to the point [that she] would be off task for 25 percent of the time." R. 52. The expert responded that such a limitation "would preclude competitive work." Id.

D. The ALJ's Decision

On March 28, 2012, the ALJ issued a decision denying Lluberes's request for disability and SSI benefits. R. 23-31. The ALJ found that Lluberes had not engaged in substantial gainful activity since the alleged onset date of February 7, 2009, and that she met the insured status requirement through December 31, 2012. R. 25.

The ALJ concluded that Lluberes suffers from the following severe impairments: "schizoaffective disorder, depressive type, history of drug dependence." R. 25. However, he assessed that Lluberes "does not have any impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 26. Specifically, he determined that Lluberes's mental impairments do not satisfy Listing 12.04 because they do not meet the "paragraph B" criteria, requiring either repeated episodes of extended decompensation or two of the following: marked difficulties in activities of daily living; marked difficulties in maintaining social functioning; or marked difficulties in maintaining adequate concentration, persistence, or pace. Id.; see 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04(b), 12.04(c). The ALJ explained that Lluberes has only "mild restrictions" in activities of daily living, because she "is fully independent" and can "cook, clean, shop, launder, take care of her personal hygiene[,] . . . manage her own finances[,] . . .

[and] can travel independently by public transportation." R. 26  He found that she has only "moderate difficulties" in social functioning because "there is nothing in the record to suggest that [Lluberes] had difficulties appropriately interacting with others." Id.  He decided that she also has "moderate difficulties" in concentration, persistence, and pace. Id.  He assessed that Lluberes has "experienced no episodes of decompensation, which have been of extended duration." Id.

The ALJ then determined that Lluberes "has the residual functional capacity ["RFC"] to perform a full range of work at all exertional levels but with the following non-exertional limitations: [Lluberes] can remember, understand and carry out simple instructions, make simple work-related decisions, maintain attention and concentration for routine work, can adapt to usual changes and stress in work place, maintain regular work schedule, with occasional inability to work in proximity with others." R. 26-27.  The ALJ noted that Lluberes had testified that "she cannot take public transportation by herself for fear of getting lost . . . [and] that she cannot remember anything, that she spends most of her time by the window, looking outside, and that she hardly eats." R. 27.  However, he found Lluberes "not to be a credible witness" because there were "multiple inconsistencies in [her] testimony and allegations." Id.  For example, when she was first admitted to St. Joseph's Hospital, Lluberes "denied all drug use" until her toxicology report tested positive for cocaine. Id.  Additionally, Lluberes "told the state consulting examiner that she stopped working in 2007 due to psychiatric symptoms, yet she testified at the hearing that she had been laid off." Id.  Also, Lluberes's "allegations of forgetfulness and inability to remember anything are clearly not supported by the record, as Dr. Nunez'[s] notes consistently indicate [that Lluberes had] intact memory and cognition, which is also indicated in the consultative examination report." Id.  Given this, the ALJ found that

Lluberes's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . [but that] [Lluberes's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with [his RFC findings]." R. 28.

The ALJ analyzed the available medical evidence including Lluberes's treatment records from New York Presbyterian Hospital Psychiatric Emergency Services, her treatment records from St. Joseph's Medical Center, the medical reports completed by treating physician Dr. Giovanny Nunez, the report completed by consultative psychologist Dr. Michael Alexander, and the State Agency medical reports. R. 27-30. After summarizing the records provided by Dr. Nunez, the ALJ assigned Dr. Nunez's opinions "little weight" because "they are grossly exaggerated and contrary to [her] own treatment notes, which show a much higher degree of functioning." R. 29. He further explained that Dr. Nunez's contemporaneous notes suggested that Lluberes was "presented with occasional depression, but all medical examinations were described as grossly within normal limits." Id. The ALJ gave "significant weight" to the opinions of consultative examiner Dr. Alexander because they "are well supported by the substantial weight of the evidence and consistent with the claimant's own testimony regarding her activities of daily living." R. 30. He noted that Lluberes's counsel had objected to this consultative report during the hearing because Lluberes "had appeared with a friend as a translator, and he was concerned that [Lluberes] might have been reluctant to disclose fully any psychiatric problems she might be having in front of a friend." R. 23. However, the ALJ overruled this objection as "speculative" because Lluberes "indicated she had no recollection of what might have occurred or what she might have said during the examination." Id.

Finally, the ALJ relied on the vocational expert's testimony to conclude that Lluberes is

capable of performing her past relevant work as a jewelry polisher because such work is "fairly repetitive and performed at the lowest semi-skilled level, so that [Lluberes] can do such work even if limited to the above-noted [RFC]." R. 31. The ALJ also found that there are other medium exertion level jobs that Lluberes would be capable of performing such as packager, laundry worker, and cleaner. Id. Thus, the ALJ concluded that Lluberes is not disabled. Id.

    E.    The Proceeding Before the Appeals Council

Lluberes submitted to the Appeals Council a request for review of the ALJ's decision. R. 15-16. On May 17, 2013, the Appeals Council denied the request for review. R. 1-3.

II.    APPLICABLE LAW

    A.    Scope of Judicial Review under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (citation and internal quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117, 127–28 (2d Cir. 2008); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127–28; Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are

9

supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. (emphasis in original) (citation and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted).

      B.      Standard Governing Evaluations of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. § 404.1520(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ," id. § 404.1520(c). Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his age, education, or work experience. Id. § 404.1520(a)(4)(iii). Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's residual functional capacity ("RFC") to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work." Id. § 404.1520(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. Id. Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity permits the claimant to do other work. Id. § 404.1520(a)(4)(v). If the claimant cannot perform other work, he or she will be deemed disabled. Id. The claimant bears the burden of proof on all steps except the final

one — that is, proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

III.   DISCUSSION

Lluberes has raised two arguments why her case should be remanded to the Commissioner: (1) the ALJ failed to develop the record after being presented with Dr. Nunez's opinion that Lluberes has borderline deficient intellectual functioning; and (2) the ALJ improperly assigned great weight to the consultative report completed by Dr. Alexander because Lluberes did not have an adequate interpreter.  See Pl. Mem. at 17-24; Pl. Reply at 1-4.  As explained below, we find both of these arguments to be without merit.

   A.   Failure to Develop the Record on Lluberes's Intellectual Deficiencies

Lluberes contends that "[f]ollowing Dr. Nunez's diagnosis finding that [Lluberes] had limited intellectual functioning, the ALJ should have developed the record to determine the extent of her limitations for basic calculations (such as serial threes) and the potential impact of her limited fund of information on the basic occupational workbase by ordering an IQ test."  Pl. Mem. at 19.  Lluberes further asserts that "the ALJ should have realized that additional information was necessary to properly ascertain the scope of [Lluberes's] limited intellectual functioning . . . [and] should [have] consider[ed] scheduling a consultative examination."  Id. at 20.  Additionally, in Lluberes's view, the ALJ's failure to contact Dr. Nunez before "cavalierly dismissing [her] diagnosis of borderline intellectually [sic] functioning" constitutes "reversible legal error."  Id. at 21.

The ALJ has an affirmative duty to develop the record in a disability benefits case. Shaw, 221 F.3d at 131.  Where the ALJ fails to develop the record, remand is appropriate.  Rosa v. Callahan, 168 F.3d 72, 82–83 (2d Cir. 1999).  The ALJ has a "duty to investigate the facts and

develop the arguments both for and against granting benefits . . . ." Sims v. Apfel, 530 U.S. 103, 111 (2000). Furthermore, the governing statute provides that the ALJ "shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make" the disability determination. 42 U.S.C. § 423(d)(5)(B); accord 20 C.F.R. §§ 404.1512(d), 416.912(d). The ALJ's duty to develop the record remains the same regardless of whether the claimant is represented by counsel. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (citing Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996)).

On the other hand, it is well-established that "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa, 168 F.3d at 79 n.5 (citing Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996) (holding that where the ALJ had "already obtained and considered reports" from treating physicians, the ALJ "had before him a complete medical history, and the evidence received from the treating physicians was adequate for him to make a determination as to disability")). While there is case law suggesting that an ALJ has a duty to develop the record where there are "inconsistencies" in a treating physician's records, see Rosa, 168 F.3d at 79 (quoting Hartnett v. Apfel, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998)); Calzada v. Astrue, 753 F. Supp. 2d 250, 278 (S.D.N.Y. 2010), we believe such cases should be read as requiring further development of the record "only where the record was incomplete," Brown v. Comm'r of Soc. Sec., 2014 WL 783565, at *17 (S.D.N.Y. Feb. 28, 2014); accord Vanterpool v. Colvin, 2014 WL 1979925, at *16-17 (S.D.N.Y. May 15, 2014) (finding that ALJ did not have a responsibility to further develop the record where there were discrepancies between the reports and contemporaneous records of the plaintiff's treating

13

physician).

Lluberes's chief contention is that when presented with Dr. Nunez's opinion that Lluberes has "borderline intellectual functioning," R. 298, 301, 315, and that "she seems to be on a level of mild mental retardation," R. 300, 306, the ALJ had an obligation to further develop the record to determine the full extent of Lluberes's intellectual impairment.[2]  In his decision, the ALJ explained that he did not give much weight to Dr. Nunez's opinions because he found them to be "grossly exaggerated and contrary to [Dr. Nunez's] own treatment notes, which show a much higher degree of functioning."  R. 29.  As to the specific issue of Lluberes's intellectual functioning, the Court finds that the ALJ was not obligated to seek clarification from Dr. Nunez or to contact other medical sources because there was sufficient detail in the record for the ALJ to conclude that Lluberes's intellectual limitations are not so severe as to preclude her from performing competitive work.  This is not a case where there was an absence of evidence in the record or where there was no discernable basis for the ALJ's findings.  To the contrary, the ALJ explained that his assessment of Lluberes's mental capabilities was largely based on Dr. Alexander's consultative psychological report, which the ALJ noted was "substantially in accordance with the objective findings contained in [Dr. Nunez's] psychiatric treatment notes."  R. 30.  In other words, in the ALJ's view, Dr. Alexander's report together with Dr. Nunez's treatment notes provided a sufficiently clear and consistent description of Lluberes's intellectual capabilities to make an RFC determination without having to seek further evidence on this medical condition.

---

[2] Lluberes has not asserted that the ALJ erred when he rejected Dr. Nunez's findings that Lluberes has marked limitations in her ability to understand and carry out instructions, extreme limitations in her ability to interact with supervisors and coworkers, and extreme limitations in her ability to respond to changes in a routine work setting.  R. 29.

Dr. Nunez's characterization in her treatment notes of Lluberes's intellectual and cognitive functioning is consistent with the ALJ's RFC findings — that is, that despite Lluberes's intellectual limitations, she would be able to perform work requiring the capacity to follow simple instructions and make simple decisions.  For example, in a treatment record dated April 1, 2011, Dr. Nunez found that although Lluberes had borderline intellectual functioning, her "[c]ognitive functioning and fund of knowledge [were] intact and age appropriate [and that her] [s]hort and long term memory [were] intact, as [was] [her] ability to abstract and do arithmetic calculations."  R. 317.  Similarly, on May 6, 2011, Dr. Nunez assessed that Lluberes's "mental status [had] no gross abnormalities" and that her "cognitive functioning, based on vocabulary and fund of knowledge, [was] intact and age appropriate, and she [was] fully oriented."  R. 318.  On November 22, 2011, Dr. Nunez wrote, "[e]xamination of [Lluberes] reveals her to have no serious mental status abnormalities . . . . There are no signs of cognitive difficulty, based on vocabulary, and fund of knowledge.  Memory is intact for recent and remote events and [Lluberes] is oriented to time, place, and person."  R. 319.  Furthermore, these records are largely consistent with the results of Dr. Alexander's consultative examination, which determined that although Lluberes's intellectual functioning was "below average," she could nevertheless "follow and understand simple directions . . . perform simple tasks independently . . . maintain attention and concentration . . . learn new tasks . . . [and] relate adequately with others."  R. 235.  In light of this evidence, the ALJ cannot be faulted for choosing not to have Lluberes undergo additional testing in a second consultative examination. This is not a case where there are "obvious gaps" in the record inasmuch as Lluberes's intellectual functioning was the specific subject of treatment notes and was addressed by the consultative examination.  See 20 C.F.R. § 404.1520b(c)(3) (consultative examination

15

permissible method to resolve inconsistencies in the record).

Moreover, the Court sees no reason why Dr. Nunez's unsupported opinion that Lluberes has borderline intellectual functioning and possibly mild mental retardation would have triggered the need for further development of the record. While Lluberes suggests in her legal memorandum that Dr. Nunez's opinion relates to a previously unexamined mental condition, see Pl. Mem. at 20, there is, as previously discussed, a great deal of evidence in the record pertaining to Lluberes's mental capabilities. Furthermore, the ALJ did not simply reject Dr. Nunez's medical opinion without stating his basis for doing so. Instead, he explained that, while Lluberes certainly has some intellectual limitations, the objective medical evidence in the record, including Dr. Alexander's consultative report and Dr. Nunez's own treatment records, suggests that Dr. Nunez's opinion on this point is exaggerated and thus should not be accepted. R. 29-30. Accordingly, we find no error in the ALJ's decision not to gather additional evidence pertaining to Lluberes's intellectual abilities.

      B.      <u>Failure to Provide Interpreter During Consultative Medical Examine</u>

Lluberes also argues that "[t]he ALJ improperly placed great weight on the consultative psychological report [provided by Dr. Alexander] notwithstanding the absence of a qualified Spanish language interpreter for the interview." Pl. Mem. at 22. Lluberes contends that the use of her friend as an interpreter calls into question the reliability of the consultative examination in two ways. First, Lluberes asserts that her friend was not a qualified interpreter and thus that there is a "question" as to whether there was accurate communication between Lluberes and Dr. Alexander during the examination. Id. Second, Lluberes contends that it is possible that she did not fully and accurately describe her intellectual and psychological difficulties to Dr. Alexander because she might have been embarrassed to speak candidly about such subjects in the presence

of a friend.  Id.  During the ALJ hearing, Lluberes's counsel objected to the admission of Dr. Alexander's report on this second ground.  R. 38-39.  However, Lluberes's counsel indicated that Lluberes "had no recollection" of the examination and thus that she was not able to identify any specific deficiencies resulting from use of her friend as an interpreter.  R. 39.  The ALJ overruled this objection because he found any argument on this point to be entirely speculative.  R. 23.

The Social Security Administration's Program Operations Manual ("POMS") states that it "will provide an interpreter free of charge, to any individual requesting language assistance, or when it is evident that such assistance is necessary to ensure that the individual is not disadvantaged."  See Social Security Administration Program Operations Manual System, DI § 23040.001(A), available at, https://secure.ssa.gov/apps10/poms.nsf/lnx/0423040001 ("POMS").  However, the SSA Manual also gives applicants the choice to use their own interpreters: "Individuals have the option of using their own interpreter, such as a family member, friend, or third party, providing the interpreter meets SSA criteria for interpreters."  Id. When an applicant chooses to use a friend or relative as an interpreter, the disability examiner is expected to take certain precautions, including determining that the proposed interpreter is qualified and having the proposed interpreter sign a form indicating that the interpreter understands both English and the language at issue.  See id. § 23040.001(H).

While Lluberes argues in her legal memorandum that these rules were violated in her case, she cites no evidence in the record on this point.  For example, although she conclusorily asserts that "the use of [her] friend is clearly inadequate to discuss her pressing psychiatric problems" and that she "believe[s] [that Lluberes's friend] was asked to interpret because Dr. Alexander's office failed to provide an interpreter," Pl. Mem. at 23, she has not pointed to anything in the record to support such contentions.  Given the complete lack of any evidence in

17

the record pertaining to this issue, any argument as to what may or may not have occurred regarding the interpreter is merely speculation.

In any event, the POMS guidelines "have no legal force, and they do not bind the Commissioner." Tejada, 167 F.3d at 775 (citing Schweiker v. Hansen, 450 U.S. 785, 789 (1981)) (internal brackets omitted); accord Binder & Binder PC v. Barnhart, 481 F.3d 141, 151 (2d Cir. 2007); Carillo-Yeras v. Astrue, 671 F.3d 731, 735 (9th Cir. 2011) (noting that POMS "does not impose judicially enforceable duties on either this court or the ALJ") (internal quotation marks and citations removed); Miller v. Astrue, 2009 WL 2568571, at *14 (N.D.N.Y. Aug. 19, 2009) ("[F]ailing to apply the POMS is not legal error."). While courts have acknowledged that the failure to provide an applicant with an interpreter at the ALJ hearing may require remand, see, e.g., Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 31 (2d Cir. 2013) ("A violation of the interpreter policy can result in the denial of a full and fair hearing."), "the failure to use an interpreter for consulting examinations" is treated differently, and instead "go[es] to the weight of that evidence rather than the fairness of the hearing." Alvarez v. Comm'r of Soc. Sec., 2011 WL 2600712, at *3 n.4 (D.N.J. June 28, 2011).

Tellingly, Lluberes has not even addressed the core question of whether her friend was unable to speak English and Spanish fluently. See POMS § 23040.001(B)(2). But as the Commissioner has pointed out, see Comm. Reply at 4, the only evidence in the record on this point suggests that Lluberes's friend was able to speak English, R. 151, 166, and presumably Spanish as he would have had to communicate with Lluberes in order for her to have arranged for his presence at her examination. Additionally, Lluberes has been unable to show that the use of her friend as the interpreter in any way affected the results of the examination. Indeed, the Court finds no indication in Dr. Alexander's report that Dr. Alexander had any trouble

18

communicating with Lluberes or that Lluberes responded to Dr. Alexander's questions with less than full candor. R. 233-36. To the contrary, Dr. Alexander was able to elicit detailed information about Lluberes's symptoms, her medical and family history, and her activities of daily living. Id. Additionally, he was able to assess her speech, thought process, concentration, memory, and cognitive functioning by asking her to perform simple tests such as counting and answering basic mathematical calculations. Id. Given the thoroughness of the report as well as its general consistency with the other evidence in the record, together with the fact that Lluberes does not recall having any difficulty communicating with Dr. Alexander during the examination or having been hesitant to speak freely in front of her friend, we conclude that the ALJ did not err in giving Dr. Alexander's medical opinion significant weight. See generally Pokluda v. Colvin, 2014 WL 1679801, at *4 (N.D.N.Y. Apr. 28, 2014) (rejecting challenge as to the adequacy of interpretation at ALJ hearing because applicant "fails to identify a single instance where she was unable to understand or otherwise disadvantaged by any communication impediment issues at the hearing"); Martinez v. Astrue, 2009 WL 840661, at *3 (D. Conn. Mar. 30, 2009) ("For there to have been prejudicial interference with [the applicant's] access to her interpreter, [the applicant] must show that, due to the alleged interference, there was a material omission or inaccurate interpretation of key testimony.") (citations omitted).

IV.    CONCLUSION

    For the foregoing reasons, the Commissioner's motion for judgement on the pleadings (Docket # 25) should be granted, and Lluberes's motion for judgment on the pleadings (Docket # 20) should be denied.

## PROCEDURE FOR FILING OBJECTIONS TO THIS
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Richard Sullivan, and to the undersigned, at 500 Pearl Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Sullivan.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: June 20, 2014
       New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge